IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 07-cv-00823-PAB-KMT


SYLVIA DEAN,

      Plaintiff,

v.

COMPUTER SCIENCE CORPORATION,

      Defendant.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

      This matter is before the court on "Defendant's Motion for Summary Judgment." ("Mot.) [Doc. No. 38, filed July 16, 2008]. Plaintiff filed "Plaintiff's Response to Motion for Summary Judgment" ("Rsp.") [Doc. No. 50] on September 19, 2008 and Defendant filed "Defendant's Reply in Support of its Motion for Summary Judgment" on October 7, 2008. [Doc. No. 51]. The issue is ripe for recommendation and ruling.

      Defendant moves for summary judgment on Plaintiff's claims of unlawful discrimination based on race, color and gender, harassment creating a hostile work environment and retaliation. Defendants claim that Plaintiff was lawfully terminated in response to a client directive to remove her from its contract for her poor performance and inappropriate behavior. They argue that Plaintiff's race, color, gender, and/or alleged participation in protected activity played no

role in her treatment at work or in her ultimate termination from employment and Plaintiff has failed to establish a *prima facie* case of unlawful discrimination, retaliation, or harassment. Further, Defendants argue that Plaintiff has also failed to demonstrate that Computer Science Corporations's ("CSC") legitimate reasons for termination were pretextual.

### *Factual Background*

The following facts are taken from Plaintiff's Complaint, the undisputed facts in both the Motion and the Response and the parties' submissions.

Plaintiff, an African-American female, was a CSC employee staffed on a Lockheed Martin Integrated Systems & Solutions contract from March 22, 2004 until February 23, 2006. (Compl. at 3-5; Mot., Undisputed Facts ["UF"] 1; Rsp. accord). While employed by CSC, Plaintiff worked on a night shift in the Cheyenne Mountain Mission Assurance Center ("CMAC") as a Database Administrator ("DBA") and was responsible for monitoring the computer systems gathering data from the North American Aerospace Defense Command ("NORAD"). (Mot. UF 1,2; Rsp. accord). Dave Stoup, a Boeing employee, oversaw the work of the CMAC team, including CSC, Boeing and BAE personnel. (*Id.*) During the relevant period, Plaintiff reported to Kenneth W. O'Neil, a CSC Senior Manager. (Mot. UF 3-4; Rsp. accord). In her role as a CMAC DBA, Plaintiff was required to complete several types of documentation during the course of each shift, which included accurately describing her database monitoring activities in a Master Station Log ("MSL"). (Mot. UF 5; Rsp. accord).

Some time prior to December, 2004, Plaintiff interviewed for a job at Boeing but was not allowed to transfer within companies on the same contract. (Compl. at 3).[1] Ultimately, Victoria Triplett, one of the people Plaintiff alleges is responsible for her later harassment, was awarded the Boeing job for which Plaintiff applied. (Compl. at 3).

Thereafter Plaintiff sought a salary increase from CSC's O'Neil which she characterized as a "Performance Increase." (Mot., Exh. A-6, email from Plaintiff dated December 1, 2004 at 8:06 a.m.). Mr. O'Neil responded, "As for a major increase based upon performance the feedback that I get about your performance is average at best. I have been told that your attention to detail is lacking, and this may be related to you being more tired than usual holding down two jobs. I have also been told that you do not necessarily complete all required shift paperwork, sometimes leaving the oncoming DB wanting when it comes to activity/problems from the previous shifts. . . . I have not received any over and above feedback on your performance to date." (*Id.*, email from Kenneth O'Neil, dated December 2, 2004 at 8:57 a.m.). Plaintiff responded to the email and in a follow-up email from Mr. O'Neil he stated, "Sylvia, I did not say your performance was an issue, what I said is that I consider you an average performer . . ." (*Id.*, email from Kenneth O'Neil, dated December 4, 2004 at 09:28:48).

---

[1] The parties dispute why Plaintiff was not allowed to take the Boeing job, however neither the reason for nor the fact that Plaintiff did not get the Boeing position is material to the courts review of this motion.

3

Approximately ten months after this exchange, on October 5, 2005, Plaintiff met with Boeing point-of-contract Stoup to discuss issues involving Plaintiff's alleged deficient MSL entries and her complaint that Jake Johnson (BAE employee)[2] and Victoria Triplett (Boeing employee) were overly critical of her work performance. (*Id.*) Either prior to or immediately following this meeting, Plaintiff sent Stoup an email.[3] The parties do not dispute that this email constituted a summary of the concerns Plaintiff raised in her meeting with Stroup. (Mot. UF 8; Rsp. re UF 8). In the email, Plaintiff admits, "Recently I feel like I have been taking a lot of heat from people for: . . . 2) MSL Entries." (Mot., Exh. A-7, email from Plaintiff dated October 5, 2005 at 2:29 p.m.) After explaining the difficult circumstances she was dealing with in her personal life, Plaintiff states, "This is enough to cause anyone to slip or not be overly expressive in an MSL entry." (*Id.*) Further she states, "I do my job to the best of my abilities although that may not be equal to some of the other people's standards. I am sure that everyone is not perfect with MSL entries. I am not sure how I became the MSL center of attention or why my coworkers and not my supervisor are constantly reviewing my MSL entries for content but I will try to do my best in being more thorough in logging, because I cannot afford to lose my job."

---

[2]According to his direct supervisor and not apparently contested by the parties, "Jack Johnson has functional responsibilities (as to other CMAC personnel) that include reviewing or checking on performance results of other CMAC people and reporting his observations to appropriate ISC2 functional leads." (Mot., Exh. A-11, email from Doug Fish at N-BAE Systems to Plaintiff dated February 10, 2006).

[3] The email states, "I have to speak my mind because I was not able to earlier . . ." indicating the email was sent after the face-to-face meeting. (Mot., Exh. A-7, email from Plaintiff dated October 5, 2005 at 2:29 p.m.).

(*Id.*)  Toward the end of the email, Plaintiff also expressed her dissatisfaction with being "under a constant magnifying glass" and told Stroup that "Victoria is a shining star in a lot of people's eyes" but that "she has it out for me and I know it."  Plaintiff also complained, "It was apparent when she [Victoria Triplett] came in on her first shift back that she had an attitude toward me . . ." (*Id.*)  In a response to this meeting and the email, Stroup responded to Plaintiff that he would like to get "together to help make your situation at CMAFS better."  (Mot., Exh. A-7, email from David Stroup dated October 7, 2005 at 18:56:05).

In early December 2005, O'Neil, Plaintiff's CSC supervisor, met with Plaintiff regarding several policy violations she had committed and her general work performance.  (Compl. at 3).  After meeting with Plaintiff on December 8, 2005, O'Neil generated a form HRMP 207 Violations.  (Mot., Exh. A-10).  Among the violations noted was that Plaintiff did not complete a timecard prior to deadline and that when confronted about it, "you [Plaintiff] noted to personnel on the operations floor that filling out your timecard was not a priority, and you were tired of Ms. Gutierrez bothering you."  (*Id.*)  Further, the HRMP noted, "It was reported that you slept several hours the night of December 1st and morning of September [sic] 2nd.  Sleeping on the job is not an acceptable practice per CSC policy."  (*Id.*)Finally, the HRMP noted, "It has been reported that you leave early, as much as 30 minutes prior to completing your shift.  In addition you fail to fill out your timecard on a daily basis often leaving it blank until submittal day."  (*Id.*)  Also included in the HRMP were action plans to correct these violations.  (*Id.*)

During the face-to-face meeting with O'Neil, Plaintiff admitted, "Okay.  Maybe I dozed off, but it won't happen again.  I'm sorry." (Mot., Exh. A-2, Deposition of Plaintiff, at 159).

O'Neil followed up on the meeting with Plaintiff with an email confirming their discussion of December 8, 2005, "specifically you [sic] recent violations of HRMP 207 as it relates to paragraph 3.1.2, 3.2.10 and 3.1.16.  Please work to avoid any future violations."  (Mot., Exh. A-8, email from Kenneth O'Neil dated December 8, 2005 at 13:44:17).

Following this meeting with Plaintiff, O'Neil sent an email to Stroup on December 16, 2005 with a directive to "distribute to all" instructing that sleeping on the job was not condoned by CMAC, ISC2 nor ISC2 program management.  (Mot., Exh. A-9).

On or about February 1, 2006, it was alleged Plaintiff was sleeping during working hours once again.  (Mot. UF 18; Rsp. accord).  On February 3, 2006, Plaintiff learned that O'Neil was  conducting an investigation in relation to the report of Plaintiff sleeping during working hours.  (Mot. UF 18; Rsp. 18-19; Mot., Exh. A-2 Deposition of Plaintiff at 168; Mot., Exh. A-8, email from Plaintiff to Bill Smith, dated February 8, 2006).  After Plaintiff learned that O'Neil was conducting an investigation, Plaintiff contacted CSC employee Jason Brown and asked him not to tell O'Neil if he had witnessed her "dozing off." (Mot., Exh. A-2, Deposition of Plaintiff at 183-185).  On February 7, 2006, O'Neil contacted Plaintiff to schedule a meeting; the meeting was arranged for February 9, 2006.  (Mot. Exh. A-8, email from Plaintiff to Smith dated February 8, 2006).

As a result of learning that O'Neil was investigating Plaintiff with respect to her allegedly sleeping on the job, Plaintiff admits that "in response" she contacted CSC's Employee Relations Department to complain of "discrimination and harassment by O'Neil."  (Mot. UF 20;

Rsp. accord[4]).  Plaintiff made this complaint "after she became aware she was to be disciplined

in an attempt to protect herself, since she feared her termination was imminent."  (Rsp. at ¶ 20).

In relation to her complaint against O'Neil, Plaintiff stated that "It is also my observation that

people who work night shift have a tendency to doze off.  Not that I am making an excuse for

this, however, this is something that has been going on for years."  (Mot., Exh. A-8).

During the meeting between O'Neil and Plaintiff on February 9, 2006, O'Neil counseled

Plaintiff regarding sleeping on the job again, and her continued timekeeping problems.  The

parties do not dispute that "during this meeting O'Neil made it clear to Plaintiff that the

counseling [meeting] related to her admitted, established performance issues, and did not

concern her interpersonal issues with non-CSC employees Johnson and Triplett."  (Rsp. at ¶22;

Mot. accord).  At the conclusion of the meeting, O'Neil told Plaintiff he would give her one

more chance and refrain from issuing a letter of reprimand, known at CSC as a Letter of Caution.

(Mot., Exh. A-12, email from Kenneth O'Neil to Plaintiff, dated February 15, 2006).

---

[4] The court notes that Plaintiff claims in her Response for the first time that her complaint against O'Neil for harassment was her "second" complaint against O'Neil.  Exhibit A-8, the email to Bill Smith in Employee Relations, was generated after O'Neil called Plaintiff to set up the meeting.  However, Exhibit A-8 begins, "Per our conversation here is what you have requested."  From that the court will infer, for the benefit of Plaintiff, the non-movant herein, that an oral conversation with Mr. Smith regarding a complaint of harassment against Mr. O'Neil may have been undertaken before O'Neil contacted Plaintiff to set up the February 9, 2006 appointment.  In any event, it is undisputed that the contact with CSC Employee Relations was undertaken after February 3, 2006 when Plaintiff first learned of O'Neil's investigation into allegations of Plaintiff sleeping on the job. (Mot., Exh. A-2, Deposition of Plaintiff at 168).

Shortly after this meeting, Plaintiff filed harassment complaints against Johnson and Triplett[5] with their respective employers, BAE and Boeing. (Rsp. at 23; Mot. accord; Mot., Exh. A-11, email from Plaintiff to Doug Fish dated February 9, 2006 at 10:00 p.m.).

On February 14, 2006, when O'Neil learned that Plaintiff had filed the complaints against Johnson and Triplett, he issued a Letter of Caution against Plaintiff even though he had told her he would not do so. (Mot., Exh. A-12, email from Kenneth O'Neil to Plaintiff dated February 15, 2006; Mot., Exh. A13, Letter of Caution). O'Neal stated, "The day following our meeting, you issue (sic) two complaints against personnel in these work centers in an effort to divert attention from your problem. Since you violated our agreement, I chose to issue the letter." (*Id.*) That same day, Plaintiff filed a complaint against O'Neil for retaliation. (Compl. at 4; Mot. accord ¶ 30).

On February 15, 2006 Plaintiff sent an email to Human Resources stating she would not sign the Letter of Caution. (Mot., Exh. 16, email from Plaintiff dated February 15, 2006 at 2:57 a.m.). On that same day, approximately 12 hours later, O'Neil attended an "Operations Management Meeting" with Lockheed Martin, CSC's customer on the Contract. (Mot. ¶ 36; Rsp. accord on this issue). On February 16, 2006, Lockheed Martin issued a directive to CSC directing "CSC to remove CMAC DBA Staff member (Silvia Cook) from the ISC2 program immediately." (Mot., Exh. A-19). Thereafter O'Neil removed Plaintiff from the Contract and terminated her employment on February 23, 2006. (Mot. ¶ 38; Rsp. accord).

---

[5] The parties apparently do not dispute that a complaint was filed with Boeing by the plaintiff against Triplett, however no evidence of that complaint was submitted to the court.

### LEGAL STANDARDS

#### A.     Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2006).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom

are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**B.      Pro Se Plaintiff**

The court notes at the outset that because Plaintiff appears *pro se*, the court "review[s] h[er] pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted). *See also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). *See also Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues").

**C.      Title 42 U.S.C. § 2000e, et seq., ("Title VII")**

**1.      Discrimination**

"Title VII prohibits an employer from terminating any individual because of 'race,

color, religion, sex, or national origin,'" 42 U.S.C. 2000e2(a)(1). In Title VII cases, the inquiry

is whether defendant intentionally discriminated against Plaintiff based on protected class

characteristics. *Jones v. Denver Post Corp.,* 203 F.3d 748, 752 (10th Cir. 2000). If a plaintiff

offers no direct evidence of discrimination, her claims must be analyzed under the

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Young*

*v. Dillon Cos., Inc*., 468 F.3d 1243, 1249 (10th Cir. 2006). Under *McDonnell Douglas*, the

plaintiff bears the burden of establishing a *prima facie* case of racial or gender discrimination

based on indirect or circumstantial evidence. *Young* at 1249.

 Under that analysis, the "not onerous" burden of establishing a *prima facie* case is placed

upon the plaintiff who must show by a preponderance of the evidence, that: (1) she belongs to a

protected class; (2) she was qualified for her position; (3) she suffered an adverse employment

action; and (3) the adverse employment action occurred under circumstances giving rise to an

inference of discrimination. *Somoza v. University of Denver*, 2006 WL 2535092 (D. Colo. 2006).

"[E]stablishing a *prima facie* case 'creates a presumption that the employer unlawfully

discriminated against the employee'. . ." *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917,

922 (10th Cir. 2001) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254

(1981)).

 If the plaintiff can satisfy this threshold requirement, the burden shifts to the employer

"to rebut the presumption of discrimination by producing evidence the termination was based on

a legitimate, nondiscriminatory reason. 'The explanation provided must be legally sufficient to

justify a judgment for the defendant . . . to frame the factual issue with sufficient clarity so that

the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Id.* (quoting *Burdine*, 450 U.S. at 255-56). The Tenth Circuit has stated that in determining whether a particular defendant has met its burden of coming forward with facially legitimate, nondiscriminatory reasons for the employment actions,

> [t]he defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the [action]; the defendant does not at this stage of proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion. . . . However, the proffered reason for the action taken against the minority employee must be reasonably specific and clear.

*EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citations omitted).

Thereafter, if the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered justification is pretextual. *Id.* This burden-shifting analysis applies both to Title VII and § 1981 claims. *See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999). The plaintiff must demonstrate that "the proffered reason [for the adverse employment action] is not the true reason either directly by showing a discriminatory reason more likely motivated the employer or indirectly by challenging the employer's reason as unworthy of credence." *McCowan*, 273 F.3d at 922 (citing *Burdine*, 450 U.S. at 256). A plaintiff's bald assertions to the contrary do not amount to proof that a company's given reason for terminating an employee is not the genuine motivating reason for the adverse action. *See Rolland v. Primesource Staffing, LLC,* 2007 WL 4205871, *4 (10th Cir. 2007); *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995). "If the defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment 'only if [she] is able to show that a genuine

dispute of material fact exists as to whether the defendant's articulated reason was pretextual.'"

*Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999) (emphasis added).

There are typically three ways that a plaintiff makes a showing of pretext: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  A plaintiff who wishes to show that a company acted contrary to an unwritten policy or to company practice often does so by providing evidence that she was treated differently from other similarly situated employees who violated work rules of comparable seriousness.  (*Id.*)

"[A] challenge of pretext requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee." *Piercy v. Maketa*,  480 F.3d 1192, 1200 (10th Cir. 2007) (emphasis added); *Green v. New Mexico*, 420 F.3d 1189, 1191 n. 2 (10th Cir. 2005); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1231 (10th Cir. 2000). "The relevant inquiry is not whether [their] proffered reasons were wise, fair or correct," but rather we ask whether they believed those reasons to be true and "acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)).  Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision. *EEOC v. Flasher Co.*, 986 F.2d

1312, 1322 n. 12 (10th Cir.1992). Accordingly, a company's good faith "perception of the employee's performance . . . is relevant, not plaintiff's subjective evaluation of [her] own relative performance." *Piercy* at 1201.

## 2. *Hostile Work Environment*

A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). "Workplace conduct is not measured in isolation . . . ." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam). Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). Hostile work environment claims based on racial or gender harassment are reviewed under the same standard as individual discrimination as noted in subsection (1) above. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).

## 3. *Retaliation*

To succeed on a claim of retaliation a plaintiff must show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Haynes v. Level 3 Communications, LLC,* 456 F.3d 1215, 1228 (10th Cir. 2006); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d

14

1193, 1198 (10th Cir.2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. — , 126

S. Ct. 2405 (2006).   These three requirements must be satisfied in the summary judgment

context by demonstrating the initial *prima facie* showing.   *Nwagbologu v. Regents of University*

*of New Mexico*, 2002 WL 532430, *2 (10th Cir. 2002); *Sanchez v. Denver Pub. Sch.*, 164 F.3d

527, 533 (10th Cir. 1998).

 As with discrimination claims, if the plaintiff establishes a *prima facie* case of retaliation,

the burden shifts to the employer to articulate a non-retaliatory reason for the adverse

employment action.   If the employer satisfies this burden, then, in order to prevail on her

retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse

action is pretextual.   *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007); *Anderson v. Coors*

*Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999).

 "A retaliatory motive may be inferred when an adverse action closely follows protected

activity.   Temporal proximity allows for a presumption of causation in the *prima facie* setting.

*Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002).

However, if the only evidence of causation is a temporal relationship, then the adverse action

must occur closely following the protected activity.   For example, an adverse employment action

that happened more than three months after the protected activity was not entitled to a

presumption of causation. *Id*.; *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)

(noting a three-month separation did not destroy any causal connection but simply failed to

establish by itself such a connection).   Unless the termination is very closely connected in time

to the protected activity, the plaintiff must rely on additional evidence beyond temporal

15

proximity to establish causation." *Anderson*, at 1179; *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

*ANALYSIS*

**A.      *Discrimination Claims***

**1.      *Prima Facie Showing of Discrimination*.**

Plaintiff Dean alleges that her termination came about as a result of her employer's discrimination against her because of her race, gender or color.  Therefore, her Complaint, together with the other submissions to date, must establish that she belongs to a protected class, in this case a racial minority and she is female, that she was qualified for the position from which she was terminated, that she suffered an adverse employment action and that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Unfortunately, Plaintiff cannot meet her initial burden of going forward with her discrimination claims.

It is undisputed that Ms. Dean is a black female and therefore is a member of several protected classes.  Additionally, it is also not disputed that she was terminated from her position with CSC, which is an adverse employment action.  However, the evidence does not establish either that she was qualified for her position or that her termination occurred under circumstances giving rise to an inference of discrimination.

Plaintiff was on notice that her employer was dissatisfied with her job performance as early as December 2, 2004 when O'Neil, her supervisor, would not give her a raise in pay, told her that her attention to detail was lacking and advised her that she did not complete the job

paperwork in an adequate manner.  (Mot., Exh. A-6).  Thereafter, Plaintiff acknowledges she continued to have performance issues concerning her MSL entries required for her position and that other personnel on the same contract team were constantly watching her and noting deficiencies in her job performance.  Plaintiff characterizes this scrutiny as "harassment," however it is clear that her job performance was being closely monitored and found repeatedly lacking by members of the team charged with ensuring that all jobs were being performed satisfactorily.  Ten months after her initial advisement by O'Neil that her work was not up to par, the plaintiff was complaining to Stoup that Johnson and Triplett were being overly critical of her job performance and she admitted that for various reasons her MSL entries continued to be deficient.  (Mot., Exh. A-7).

In December of 2005 she was reprimanded for falling asleep on the job and when she complained that others were also sleeping during working hours, O'Neil sent a company-wide email to all employees emphasizing that sleeping on the job was a violation of company policy and would not be tolerated.  (Mot., Exh. A-8).  In spite of this, in early February, 2006, Plaintiff was accused of sleeping on the job again.  Also in December, 2005, O'Neil discussed other performance issues with Plaintiff Dean including leaving early from her shifts and not completing her time card records in a timely fashion.  In fact, at that time Plaintiff and O'Neil agreed on an action plan to correct these deficiencies.  (*Id.*).

It appears from the undisputed facts that Plaintiff has not made a *prima facie* showing that she was qualified for the job she held.  In fact, it appears that for various personal reasons, Plaintiff was not qualified for the job – because of her family responsibilities and her second full

time job she appeared to be unable to stay awake during her shift and continually "dozed off" in spite of specific warnings and instructions that such behavior violated company policy and practice.

After the plaintiff had been counseled repeatedly over a fourteen month period concerning her job performance deficiencies, she was finally terminated on February 23, 2006. As grounds to support her allegations that this termination was effectuated because of her race, color or gender and not because of her job performance, Plaintiff's sole and only allegation of any discriminatory conduct occurring during the entire time of her employment was that on between two and five occasions a non-CSC employee made certain comments to her.

The Complaint contains no allegations of any derogatory statements concerning race, gender or color made by any person employed by CSC, or anyone working on the Lockheed Martin contract during the period of her employment. (Compl.) In her deposition, Plaintiff stated that on approximately "two or three, four or five" occasions Jake Johnson, a BAE employee working on the Lockheed Martin contract, made comments which she considered to be offensive and related to either her gender or race or color, such as:

- "How can you afford to live in a high-end neighborhood and drive a nice car when I can't do that?" (Mot, Exh. A-2, deposition of Sylvia Dean, 115:9-12); or
- "How can your husband not work? You must be doing something else." (*Id.* at 115:12-13); or
- "A woman is supposed to be home with her kids. Why are you working two jobs?" (*Id.* at 232:12-14); or
- "You shouldn't be working two jobs. You should be taking care of the kids. Your husband should be . . ." (*Id.* at 232:23-22); or
- "You've got that nice car. What are you doing on the side? What does your husband do on the side? He doesn't work. What does he do?" (*Id.* at 241:21-24).

It is undisputed that Plaintiff did not make complaints about these comments at any time during her employment with CSC, BAE, Boeing or Lockheed Martin. (Rsp. ¶ 42; Mot. accord; Mot., Exh. A-2, deposition of Plaintiff at 242:19-20). Plaintiff admits she never heard O'Neil or any CSC employee make any comment whatsoever or statements about Plaintiff's gender or race. (Mot., Exh. A-2 at 248:7-10). Plaintiff does not know of any other person at CSC who was discriminated against on the basis of gender or race. (*Id*. at 19-24).

Plaintiff alleges that the comment concerning other sources of income is racial in nature, however, this court does not see anything at all either racially discriminatory or discriminatory as to gender about this comment. The comment, assuming as I must for purposes of this recommendation that the comment was actually made by Johnson, might well be rude, offensive or judgmental, however that does not make it prohibited under Title VII. The plaintiff admits she never heard any comment, statement, joke or other discriminatory remark made about her or anyone else by any CSC employee that even remotely related to her race, color or gender.

This court agrees with the defendant that the plaintiff has not established a *prima facie* case for her claim of racial or gender discrimination because she has made no showing that any of the defendants' actions occurred under circumstances giving rise to an inference of discrimination. Simply put, Plaintiff has not submitted any evidence that she was treated any differently than any non-protected class employees at CSC and her conclusory allegations of discrimination, without more, are insufficient to create a genuine issue of material fact that would defeat defendants' summary judgment motion on her discrimination claims. *Annett v. University of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004).

### 2.    *Legitimate, Nondiscriminatory Motive for Employment Action*

Further, even if it were to be held that Plaintiff has met her admittedly low burden

concerning a *prima facie* showing of discrimination, the defendant has presented ample evidence

that her termination was based on a legitimate, nondiscriminatory reasons.

The plaintiff argues that others on her job team were being overly critical of her and that

her substandard work performance should be excused since she had numerous personal issues

occurring over the time period.  "It is the manager's perception of the employee's performance

that is relevant, not Plaintiff's subjective evaluation of his own relative performance" when

analyzing a claim of pretext for an adverse employment decision.  *Furr v. Seagate Tech., Inc*., 82

F.3d 980, 988 (10th Cir. 1996).

The plaintiff herself admits to most of the shortcomings in her conduct, but minimizes

their importance in the context of her overall job performance.  There were several "write-ups"

and counseling over the course of Plaintiff's employment with CSC and the company found a

need for constant close monitoring of Plaintiff's job output.

As noted above, and in the undisputed facts section of this Recommendation, CSC

counseled Plaintiff on what it perceived to be numerous workplace violations and substandard

performance in her job for a period of fourteen months before finally terminating her

employment.  "[P]laintiff's 'mere conjecture that [her] employer's explanation is a pretext for

intentional discrimination is an insufficient basis for denial of summary judgment.' " *Panis v.

Mission Hills Bank, N.A*., 60 F.3d 1486, 1491 (10th Cir. 1995) (quoting *Branson v. Price River

Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988)); *Jones,* at 754.

This court finds that CSC has established legitimate, non-discriminatory motives for its employment action.

### 3. *Pretext*

Finally, even if the plaintiff had established a *prima facie* case of discrimination in the first instance, since the defendant was able to establish rational and reasonable work related grounds for its termination decision, the burden would shift back to the plaintiff to demonstrate that the defendant's proffered justification is pretextual

To establish pretext, a plaintiff must show either that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (emphasis added). A plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997); *Nwagbologu* at *2.

Plaintiff has presented no evidence that the actions undertaken by the company during the course of her employment were pretextual. In spite of classifying her only as an average worker and noting deficiencies in one of the most important aspects of her job, her MSL entries, the company continued to counsel the plaintiff and work with her on action plans to improve her job performance over a fourteen month time period. Plaintiff Dean has not brought forth any

discriminatory reason for her termination[6] nor has she established that the company acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances. In fact, several months before she was terminated, O'Neil generated a form HRMP 207 outlining several non-compliance issues and violations by Dean which also included a written plan for improvement in those area. Likewise, Dean has not produced any evidence that the defendant acted contrary to an unwritten policy or contrary to company practice with respect to her termination. Her only claim of being treated differently from other similarly situated employees was that on her first "write-up" about sleeping on the job, she acknowledged that the behavior was contrary to company policy but she complained that others also slept on the job. In response, O'Neil sent out a company-wide directive reminding all employees that sleeping on the job was a prohibited practice. Within approximately one and one-half months, Plaintiff was reported as sleeping on the job again, in spite of O'Neil's warnings to all company employees.

This court again agrees with the defendant that Plaintiff has submitted nothing to establish a genuine issue of material fact that the basis for her termination of employment was pretextual. In fact, undisputed documents and facts show that Plaintiff was subject to dismissal for violations of company policy and her own poor job performance.

---

[6] The retaliation claim will be addressed in this Recommendation, *infra*.

### B. Hostile Work Environment

In determining whether an actionable hostile work environment claim exists, courts will look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

As set forth herein, there are no facts supporting any claim of hostile work environment. There is no series of discriminatory acts which affected the plaintiff. Indeed there was very close watch over her work product and performance; whether the plaintiff believes such scrutiny was justified or not, is not the point. There is simply no evidence that it was motivated by an improper consideration. At the absolute most, there were between two to five "offensive utterances" made by a person who did not work for CSC over the entire course of Plaintiff's twenty-three months of employment.

On the undisputed facts, there is no evidence that the CSC workplace was permeated with 'discriminatory intimidation, ridicule, and insult,' at all, much less that rose to the level of an abusive working environment.

### C. Retaliation

#### 1. Prima Facie Case

Plaintiff alleges that the issuance of the Letter of Caution by O'Neil and her termination several days later was in retaliation for Plaintiff's filing of complaints against O'Neil, Johnson and Triplett with their respective companies alleging discrimination.

23

In order to state a *prima facie* case of retaliation, Dean must present evidence to show that she engaged in protected opposition to discrimination, that a reasonable employee would have found the challenged action materially adverse, and that a causal connection existed between the protected activity and the materially adverse action. As noted herein, Plaintiff is entitled to a presumption of causal connection if there is sufficient temporal proximity between the adverse action and the protected behavior.

Sometime between February 3, 2006 and February 7, 2006, the plaintiff filed a complaint against O'Neil for "discrimination and harassment." The plaintiff admits she filed this complaint "in response" to learning that O'Neil was investigating the allegation that Plaintiff had been sleeping on the job again "after she became aware she was to be disciplined in an attempt to protect herself, since she feared her termination was imminent." (Rsp. at ¶ 20). This is not, in this court's opinion "protected activity" since no one has the right to file false discrimination complaints against another simply as a defense to being reprimanded for on-the-job failures.

The meeting between Dean and O'Neil proceeded on February 9, 2006 and the parties do not dispute that the meeting concerned only the allegations that she had been sleeping on the job again and her continued time keeping and reporting infractions. At the conclusion of the meeting, O'Neil told the plaintiff she would not be formally reprimanded by a Letter of Caution. After the meeting, on February 9, 2006, Plaintiff filed complaints against Johnson and Triplett for discrimination and harassment with their respective companies. As noted herein, Plaintiff had complained previously about what she characterized as continued harassment by Johnson

and Triplett. (October 5, 2005 email to Dave Stroup, Mot., Exh. A-7). The court finds that the filing of the complaints against Johnson and Triplett was protected activity.[7]

Five days later, on February 14, 2006, Mr. O'Neil issued a Letter of Caution to the plaintiff in spite of having agreed not to do so on February 9, 2006. In a written correspondence to Plaintiff, O'Neil stated after learning Plaintiff had filed discrimination complaints that he considered her filing of the complaints to be in violation of their agreement gave that as the reason why he issued the Letter of Caution. Plaintiff then filed a claim of retaliation against O'Neil. This, too, was protected conduct.

The very next day, on February 15, 2006, O'Neil attended an "Operations Management Meeting" with the client of the CSC contract, Lockheed Martin, and apparently discussed Sylvia Dean. One day later, February 16, 2006, Lockheed Martin issued a directive to CSC to remove Plaintiff from the program immediately. O'Neil then removed her and she was terminated on February 23, 3006.

Clearly, Plaintiff has made a sufficient *prima facie* case of retaliation. She engaged in protected activity and a few days later O'Neil, by his own written admission, retaliated against her by issuing the Letter of Caution, something he had agreed not to do. Within a period of hours following her complaint against O'Neil, Lockheed Martin had been persuaded to issue a letter demanding that Plaintiff be removed from their contract and she was terminated approximately one week later.

---

[7] Whether the complaints were ultimately successful is irrelevant in the retaliation context.

### 2. *Legitimate, Non Discriminatory Motivation*

In response to Plaitniff's *prima facie* showing, the defendant is entitled to offer a "legitimate, nondiscriminatory reason for the adverse employment action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir.2001).

Without repeating the facts of this case *ad nauseam*, it is clear that CSC had valid, legitimate and non-discriminatory motives to terminate Dean. It is also true that O'Neil issued the Letter of Caution in direct retaliation for Plaintiff's filing discrimination complaints against Johnson and Triplett. Warning letters and reprimands can be adverse employment actions. *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir.2005). "A reprimand, however, will only constitute an adverse employment action if it adversely affects the terms and conditions of the plaintiff's employment-for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities." *Tapia v. City of Albuquerque*, 2006 WL 308267, *4 (10th Cir. 2006)

The Letter of Caution did not affect Dean's pay or benefits. *Id.*; *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir.2000). The fact that the Letter of Caution indicates that Dean could be disciplined for a future incidents of sleeping on the job and failure to properly complete job paperwork is not enough to conclusively determine that the letter itself was a disciplinary action. In fact, the Letter on its face suggests that Plaintiff contact the CSC Life Management Program to help with "personal matters" and offers to assist the plaintiff "in meeting these objectives."

What remains a material disputed fact, however, is whether O'Neil took that letter – or information about its issuance and contents – to Lockheed Martin the day after it was issued and used that as a basis for persuading them to ask for Plaintiff's removal from the project and, if so, what his motivations were in so doing. The temporal proximity between the time the Letter of Caution was issued and Lockheed Martin requested she be removed from the contract suggests that a retaliatory motive precipitated advising Lockheed Martin about Plaintiff's continuing and noted performance issues. It was this advisement which directly caused the plaintiff to be terminated at that time.[8]

### 3. Causal Connection

The undisputed record and evidence before this court shows that CSC had been cognizant and forthright about deficiencies in Dean's work performance. In fact, Plaintiff on several occasions noted that she felt her work was being closely monitored and that she was being criticized. What appeared to Ms. Dean as criticism, however, appears to this court as a reasonable effort, over a period encompassing 60% of the entire time of Plaintiff's employment, to point out problems and issues she was having with her work and give her an opportunity to correct errors and improve in her job. Again, in several pieces of correspondence occurring

---

[8] At trial, if Plaintiff proves that O'Neil and CSC harbored a retaliatory intent, given the obvious "mixed motive," CSC will be able to attempt to prove the "same decision" affirmative defense. See 42 U.S.C. § 2000e-5(g)(2)(B) (codifying "same decision" defense). CSC could avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision without the retaliation motive. *Vialpando v. Johanns*, 2008 WL 410369, *5 (D.Colo. 2008). Again, however, this is an issue for the jury, not for this court on summary judgment.

during the relevant time period, Plaintiff acknowledges that her performance could stand improvement but offers a multitude of excuses for why she is sleeping, not filling out her paperwork, not correctly or adequately doing MSL docketing and not keeping accurate time records. Finally, knowing that she was facing discipline once again from O'Neil for the report of sleeping during duty hours, Dean asks another employee not to report her for the conduct.

However, as set forth above, Plaintiff did engage in protected activity when she filed complaints against Johnson and Triplett on February 9, 2006. The fact that she filed the complaints against these non-CSC employees was the self-admitted reason O'Neil issued the Letter of Caution. Even though this court finds that based on the evidence in the case there is no genuine issue of material fact in dispute that would lend a reasonable person to conclude that Dean's termination was based on either her race, gender or color, it remains in dispute whether her actual termination in February, 2006, came as a result of her performance issues or because she angered O'Neil by engaging in protected activity.

The causal connection between Dean's protected activity of filing complaints alleging discrimination against Johnson, Triplett and O'Neil and her termination from employment by CSC at that particular moment in time remains a dispute which cannot be resolved on summary judgment, but rather remains a genuine issue for trial.

Wherefore, based on the foregoing it is this courts

### *RECOMMENDATION*

That Defendant's Motion for Summary Judgment [Doc. No. 38] be **GRANTED** in part and **DENIED** in part.

1. It is **RECOMMENDED** that Plaintiff's claims for discrimination and hostile work environment be **DISMISSED**.

2. It is also **RECOMMENDED** that Plaintiff's claim for retaliation be allowed to proceed to trial.

### ADVISEMENT TO THE PARTIES

Within ten days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Property*, 73 F.3d at 1059-60 (a party's objections to the Magistrate Judge's report and recommendation must be both

timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 25th day of February, 2009.

BY THE COURT:

_____

Kathleen M. Tafoya
United States Magistrate Judge